# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **TERESA K. PAYNE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:04cv00065 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the ALJ for further consideration.

### I. Background and Standard of Review

Plaintiff, Teresa K. Payne, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Payne filed her application for SSI on or about July 3, 2001, alleging disability as of October 31, 2000, based on a hearing impairment , a speech impairment, arthritis, migraine headaches, depression, panic attacks, arm pain and numbness in the left arm and leg. (Record, ("R."), at 69-81, 101, 128.) Payne's claim was denied both initially and on reconsideration. (R. at 42-44, 47, 49-50.) Payne then requested a hearing before an administrative law judge, ("ALJ"). (R. at 52.) The ALJ held a hearing on January 22, 2003, at which Payne was represented by counsel, but the ALJ held the record open for the submission of additional evidence. (R. at 426-72.) A supplemental hearing was held on September 3, 2003, at which Payne was again represented by counsel. (R. at 473-528.)

By decision dated September 27, 2003, the ALJ denied Payne's claim. (R. at 20-31.) The ALJ found that Payne had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 30.) The ALJ found that the medical evidence established that Payne had severe impairments, namely impaired auditory acuity with

-2-

associated speech impairment, chronic pain syndrome, arthritis/joint dysfunction, borderline intellectual functioning, an anxiety disorder and a depressive disorder, but she found that Payne did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 30.) The ALJ further found that Payne's allegations regarding her limitations were not totally credible. (R. at 30.) The ALJ found that Payne had the residual functional capacity to perform light work,[1] involving simple, routine tasks and requiring minimal levels of concentration and attention, with a moderate limitation in the ability to deal with the public, co-workers and supervisors and, due to her hearing loss, should not be around loud noises and should avoid tasks that would require more than occasional bending, kneeling, stooping, crouching, balancing and climbing. (R. at 30.) Thus, the ALJ found that Payne was unable to perform any of her past relevant work. (R. at 30.) Based on Payne's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ further found that there were other jobs available that Payne could perform. (R. at 30-31.) Thus, the ALJ found that Payne was not under a disability as defined in the Act, and that she was not entitled to benefits. (R. at 31.) *See* 20 C.F.R. § 416.920(g) (2004).

After the ALJ issued her opinion, Payne pursued her administrative appeals, (R. at 13), but the Appeals Council denied her request for review. (R. at 6-9.) Payne then filed this action seeking review of the ALJ's unfavorable decision, which now stands

---

[1]Although the formal findings of the ALJ state that Payne can perform "less" work, in the body of her decision, she clearly states that Payne can perform "light" work. (R. at 26, 30.) Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2004).

as the Commissioner's final decision.  *See* 20 C.F.R. § 416.1481 (2004).  The case is before this court on Payne's motion for summary judgment filed December 22, 2004, and the Commissioner's motion for summary judgment filed March 23, 2005.

## II. Facts[2]

Payne was born in 1962,[3] (R. at 69, 434), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c).  She has a high school education.[4]  (R. at 107.) Payne has past relevant work experience as a sewing machine operator and a server in a restaurant.  (R. at 102, 442-43.)

Payne testified at her first hearing on January 22, 2003, that she last worked in August 2000 for a few days at K-Mart before being fired.[5]  (R. at 441.)  Before that, Payne stated that she worked as a server in a restaurant from October 1999 to January 2000, but had to stop working there because she got customers' orders wrong and had coordination problems.  (R. at 442.)  She testified that she worked at a sewing

---

[2]Because Payne raises issues relating only to her mental impairments on appeal, I will address only the testimony and the medical evidence relating to Payne's mental impairments.

[3]Payne reported on her SSI application that she was born in 1962. (R. at 69.) However, at her initial hearing, she testified that she was born in 1964. (R. at 434.) In either event, Payne would be classified as a younger person.

[4]There is some conflict in the record regarding Payne's education.  Although she consistently reported having a high school education, her counsel at the supplemental hearing argued that Payne did not receive a diploma, but merely a certificate for attendance.  (R. at 479.)  In any event, it is clear that Payne attended high school classes through the date that she could have graduated.

[5]Although the ALJ noted that the record showed that Payne last worked in August 2001, Payne stated that that was wrong.  (R. at 441.)

-4-

factory from 1997 to 1999, but had to quit due to hand and chest pain, as well as problems with her "nerves." (R. at 442-43.) Payne admitted that the factory also was closing down. (R. at 443.)

Payne testified that she "barely" graduated from high school and took special education courses and speech therapy classes. (R. at 444.) She stated that she was in special education primarily due to hearing problems, which she had experienced since birth. (R. at 444.) Payne testified that she began seeing Dr. Riaz in 2000 for her "nerves." (R. at 447-48.) She stated that she was unable to deal with society, and she opined that such feelings were due to her hearing problems and poor health, resulting in an inability to work. (R. at 448.) She stated that she was hospitalized in November 2000 because she was on the verge of a nervous breakdown. (R. at 451.) At the time of the hearing, she stated that she was taking Paxil and Seroquel for her nerves. (R. at 453.) She stated that she saw things out of the corners of her eyes and heard voices calling her name. (R. at 453-54.) However, Payne testified that the medication was not helping her because she continued to hear voices. (R. at 454.) She stated that she stayed anxious constantly, hiding in the bathroom and crying. (R. at 462.)

Payne testified that performing household chores resulted in pain, noting that her husband and son performed most of the chores. (R. at 458.) She stated that her husband also had to help her shower. (R. at 458.) Payne testified that she had difficulty with concentration and memory. (R. at 463.) She testified that she completed the forms in the record with the help of her husband. (R. at 460.)

Phyllis Shapiro, a vocational expert, also was present and testified at Payne's

initial hearing. (R. at 465-72.) Shapiro classified Payne's past work as a waitress and as a sewing machine operator as light and unskilled. (R. at 467-68.) Shapiro was asked to consider a hypothetical individual of Payne's age, education and work experience, who could perform light work, but who would be moderately limited in her ability to concentrate, who could not work in a very noisy environment, who was at least mildly limited in her ability to handle and finger objects and who was at least mildly limited in her ability to climb, to balance, to kneel, to crouch, to crawl and to stoop. (R. at 468.) Shapiro testified that such an individual could perform jobs existing in significant numbers in the national economy, including the jobs of a housekeeper, a cleaning service worker, a janitor and a cashier/clerk. (R. at 469.) Shapiro also was asked to consider the same individual, but who also was limited in her ability to work with the public due to hearing difficulties. (R. at 469.) Shapiro testified that the cashier/clerk jobs would be reduced by 30 percent at most for such an individual. (R. at 469-70.) However, Shapiro stated that the individual could still perform the job as long as it was not in a noisy environment. (R. at 469.) Shapiro further testified that the cashier/clerk jobs for an individual who experienced moderate limitations in fine manipulation might be reduced by 20 percent. (R. at 470.) In any event, Shapiro testified that significant numbers of jobs in the national economy would remain. (R. at 469.) Shapiro was next asked to consider the first hypothetical individual, but who also was moderately restricted in the ability to perform acts within a schedule, to maintain regular attendance and to be punctual within customary tolerances. (R. at 471.) Shapiro testified that such an individual would not be able to perform any jobs. (R. at 471.) Shapiro next testified that an individual who was moderately restricted in the ability to complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace would be

-6-

unable to perform any jobs.  (R. at 471.)

A supplemental hearing was held on September 3, 2003.  (R. at 473-528.) Payne testified that she first saw Dr. Riaz in 2000 for a consultative examination and, thereafter, began receiving treatment from him.  (R. at 488.)  She testified that Dr. Riaz diagnosed her with depression.  (R. at 488.)  Payne testified that she was taking Vistaril, Celexa, Remeron, Lexipril and Lortab.  (R. at 492.)  However, she stated they did not help her condition.  (R. at 493.)  Payne testified that she saw Dr. Riaz monthly for approximately 15 minutes for medication checks.  (R. at 494.)  She stated that she was not seeing a counselor, nor had Dr. Riaz recommended that she see one.  (R. at 494.)  Payne admitted to using marijuana "rarely," noting that she might smoke it once a month.  (R. at 495.)   She testified that she was mostly compliant with her medications, noting that she sometimes forgot to take it.  (R. at 499.)

Payne testified that she was in special education classes during school.  (R. at 500.)  She stated that she panicked around people, noting that she would become very hot, start shaking and trembling, have difficulty breathing and experience pain and pressure in her chest.  (R. at 510.)  She stated that she went to the hospital because she thought that she was having a heart attack.  (R. at 510.)  However, she stated that she was told that she was having a panic attack.  (R. at 510.)  Payne testified that she experienced daily drowsiness, dizziness and loss of balance as a side effect of her medications, requiring her to lie down.  (R. at 526-27.)

Payne testified that she tried to perform household chores, but it was too difficult for her, noting that her husband and son performed the chores.  (R. at 512.)

Case 1:04-cv-00065-PMS   Document 26   Filed 04/28/05   Page 7 of 22   Pageid#: 72

Payne testified that she sometimes accompanied her husband to the grocery store, but usually did not go inside.  (R. at 512.)

Robert Jackson, a vocational expert, also was present and testified at Payne's supplemental hearing.  (R. at 517-18, 521-25, 527-28.)  Jackson was asked to consider a hypothetical individual of Payne's age, who had a poor education, including poor reading, writing and math skills, who could perform light work requiring one- to two-step tasks, who was moderately restricted in her ability to concentrate, to deal with the public, co-workers and supervisors, who required very little contact with the public, who could not work in a noisy environment and who could occasionally climb, stoop and crawl.  (R. at 521.)  Jackson testified that such an individual could perform the light jobs of a cleaner and an inspector/grader.[6]  (R. at 31, 521-22.)  Jackson testified that an individual as limited as set forth in Payne's testimony would not be able to perform any work.  (R. at 527-28.)

In rendering her decision, the ALJ reviewed records from Dr. Riaz U. Riaz, M.D., a psychiatrist; West Virginia Department of Rehabilitation; Tug River Health Associates; Bluefield Regional Medical Center; Dr. Gary Craft, M.D.; Melinda Wyatt, M.S., a licensed psychologist; Dr. A. James Paine Jr., M.D.; Debra L. Lilly, Ph.D., a state agency psychologist; Dr. Aroon Suansilppongse, M.D., a psychiatric consultant; Dr. M. Lambrechts, M.D., a state agency physician; Dr. Yogesh Chand, M.D.; Princeton Community Hospital; Medical Rehabilitation Association; Blue Ridge

_____

[6]I note that page 522, which contains some of the vocational expert's testimony regarding what jobs the hypothetical individual could perform, is missing from the record.  However, the ALJ listed the jobs that Payne could perform as found by the vocational expert.  (R. at 31.)

-8-

Hearing and Balance Clinic; Dales Chiropractic; Dr. Carl R. Shelton, M.D.; Dr. K. Rana, M.D.; St. Luke's Hospital; Dr. Walid Azzo, M.D., Ph.D.; and McDowell County Public Schools. Payne's attorney submitted additional medical records from Dr. Riaz to the Appeals Council.[7]

Payne saw Dr. Gary Craft, M.D., on August 31, 2001, at the request of Disability Determination Services. (R. at 172-81.) At that time, Payne gave a history of anxiety/depressive disorder. (R. at 172.) Dr. Craft noted that despite Payne's complaints of an anxiety/depressive disorder, she was "very well oriented, related well, and was free of any overt psychiatric behavior." (R. at 174.) He rated her long-term prognosis for the anxiety/depressive disorder as "good." (R. at 174.)

On the same day, Melinda Wyatt, M.S., a licensed psychologist, completed a mental evaluation at the request of Disability Determination Services. (R. at 182-88.) Wyatt noted that Payne was cooperative and appeared motivated. (R. at 182.) Payne reported nervousness, impaired memory and feelings of restlessness and fidgeting. (R. at 183.) She also reported increased irritability and chronic worry. (R. at 183.) Payne denied suicidal or homicidal ideations, auditory or visual hallucinations or any additional mental health concerns. (R. at 183.) Wyatt noted that no records were available for review. (R. at 183.) Payne denied having undergone any psychiatric or psychological treatment. (R. at 183.) She reported graduating from high school at age

---

[7]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Case 1:04-cv-00065-PMS   Document 26   Filed 04/28/05   Page 9 of 22   Pageid#: 74

19, but reported a history of special education classes. (R. at 183.) She stated that she received mostly Ds and Fs, noting that she was retained in the third grade. (R. at 183-84.) She reported that she attended business courses through the Mercer County Vocational Technical Center as part of the Welfare to Work Program in 1995, but described her grades as poor. (R. at 184.) Payne stated that she dropped out of the program prematurely because she was unable to transcribe shorthand with a headset. (R. at 184.) She reported obtaining her driver's license after three attempts at the written test. (R. at 184.) Payne reported little contact with others outside of the home. (R. at 184.)

Wyatt noted that Payne presented as extroverted and spontaneously generated conversation. (R. at 185.) Her mood appeared anxious, as evidenced by hand wringing. (R. at 185.) Payne's affect was broad and her stream of thought was organized and logical. (R. at 185.) There was no evidence of a thought content impairment. (R. at 185.) Likewise, there was no evidence of hallucinations or delusions on the day of the evaluation. (R. at 185.) Payne's insight appeared limited, and her judgment appeared markedly deficient. (R. at 185.) Payne's immediate memory was within normal limits, but her recent memory was markedly deficient. (R. at 185.) Her remote memory appeared impaired and her concentration appeared moderately deficient. (R. at 186.)

Wyatt administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test, on which Payne obtained a verbal IQ score of 66, a performance IQ score of 74 and a full-scale IQ score of 67. (R. at 186.) Wyatt noted that these scores might be lowered by Payne's impaired auditory acuity and impaired

concentration. (R. at 187.) She recommended further assessment. (R. at 187.) Wyatt also administered the Wide Range Achievement Test-Third Edition, ("WRAT-III"), which revealed that Payne's reading and spelling skills were at the sixth-grade level, while her arithmetic skills were at the fifth-grade level. (R. at 187.) Wyatt again noted that these scores might be an underestimate due to Payne's hearing and concentration impairments. (R. at 187.) Wyatt diagnosed Payne with a generalized anxiety disorder, and she noted that, with appropriate treatment, Payne's prognosis was guarded. (R. at 187.) Wyatt noted that Payne interacted in a "mildly deficient fashion," as evidenced by impaired auditory acuity and impaired concentration. (R. at 188.) She further noted that Payne's persistence appeared mildly deficient and that her pace appeared moderately slow. (R. at 188.) Wyatt concluded that Payne was capable of managing her own benefits. (R. at 188.)

On November 2, 2001, Debra L. Lilly, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment. (R. at 199-202.) Lilly found that Payne was moderately limited in the ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the general public. (R. at 199-200.) In all other categories of mental functioning, Lilly found Payne not significantly limited. (R. at 199-200.) Lilly concluded that Payne retained the ability to learn and perform simple, unskilled work-like activities. (R. at 201.)

Lilly also completed a Psychiatric Review Technique form, ("PRTF"), concluding that Payne suffered from an anxiety-related disorder, specifically, generalized anxiety disorder. (R. at 203-16.) However, Lilly concluded that Payne was only mildly restricted in her activities of daily living, experienced moderate difficulties maintaining social functioning, experienced moderate difficulties maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 213.)

On November 13, 2001, Dr. Aroon Suansilppongse, M.D., a psychiatric consultant, concluded that Payne retained the mental capacity to perform simple work activity. (R. at 218.) He agreed with all of Lilly's findings, with the exception of Lilly's finding that Payne had not suffered any episodes of decompensation and that she was not significantly limited in her ability to adapt. (R. at 219.)

On October 14, 2002, Payne saw Dr. Yogesh Chand, M.D., for an evaluation. (R. at 388-90.) Dr. Chand noted, among other things, that Payne was alert and fully oriented, and he rated her insight and judgment as satisfactory. (R. at 389.) Dr. Chand noted that Payne's comprehension for commands was good and her naming and repetition were normal. (R. at 389.) Dr. Chand found that Payne's memory for recent and remote events was satisfactory. (R. at 389.) Payne was diagnosed with anxiety and a stress disorder, among other things. (R. at 390.)

Payne saw Dr. Riaz on October 30, 2002, for a psychiatric evaluation. (R. at 354-56.) At that time, she reported no prior psychiatric treatment. (R. at 355.) Dr. Riaz noted that Payne had "severe psychomotor retardation," noting that she appeared

-12-

anxious and depressed, wringing her hands and crying during the interview. (R. at 355.) Dr. Riaz described Payne's mood as depressed and anxious, and he noted that she had difficulty relating to him. (R. at 355.) Her speech was described as nonspontaneous, and Dr. Riaz noted that Payne had suicidal thoughts "off and on every day." (R. at 355.) Payne reported auditory and visual hallucinations, as well as feeling that people were "against her," watching her and talking about her. (R. at 355.) Dr. Riaz noted that Payne was fully oriented, but had difficulty with abstract thinking. (R. at 356.) Her memory for recent and remote events was deemed fair, her attention and concentration as poor and insight and judgment as present. (R. at 356.) Dr. Riaz diagnosed Payne with major depression, severe, with suicidal ideations. (R. at 356.) He rated her prognosis as "poor." (R. at 356.)

Dr. Riaz concluded that Payne was incapable of gainful employment, noting that she was unable to interact appropriately with co-workers and supervisors or to perform repetitive tasks at a sustained level. (R. at 356.) Dr. Riaz stated that Payne was not a suitable candidate for vocational rehabilitation, but he found that she was capable of managing her own benefits. (R. at 356.) Dr. Riaz opined that Payne needed to be admitted to a hospital, and he attempted to do so, but no bed was available at that time. (R. at 356.)

On November 5, 2002, Payne was admitted to the Behavioral Medicine Center at Princeton Community Hospital based on "nerves and pain." (R. at 273-75.) She stated that her hobbies included watching television and sitting around the house. (R. at 274.) She stated that she did not have many friends, preferring to be alone. (R. at 274.) Dr. Philip B. Robertson, M.D., noted that Payne's psychomotor activity

appeared normal and she was cooperative throughout the interview. (R. at 274.) Her mood was described as depressed with an appropriate affect. (R. at 274.) Payne admitted to auditory hallucinations, but denied visual hallucinations. (R. at 274.) She admitted to suicidal ideations without a specific plan. (R. at 274.) Her thought process and content were deemed appropriate, and she was alert and fully oriented. (R. at 274.) Payne's memory appeared intact, and she had appropriate concentration and good attention. (R. at 274.) Dr. Robertson opined that Payne was of moderate intelligence. (R. at 274.) She was diagnosed with a major depressive episode and a then-current Global Assessment of Functioning, ("GAF"), score of 40.[8] (R. at 275.)

The following day, Staci Craft, a social worker at the Behavioral Medicine Center, noted that Payne was coherent and displayed no overt signs of psychosis. (R. at 272.) Payne's mood was depressed, but her affect was pleasant. (R. at 272.) Craft opined that Payne was of average intelligence, and she noted that her insight and judgment appeared to be intact. (R. at 272.) Payne's recent and remote memory also appeared intact. (R. at 272.) However, Craft opined that Payne's self-esteem and ego strength were decreased. (R. at 272.) Craft noted that Payne would undergo individual, group, activity, psychoactive and milieu therapies while there, and that outpatient services would be scheduled with Dr. Robertson. (R. at 272.)

---

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...." DSM-IV at 32.

-14-

On December 19, 2002, Dr. Riaz noted that Payne's mood was depressed. (R. at 394.) However, he found that she was fully oriented. (R. at 394.) She was prescribed Paxil CR and Seroquel. (R. at 394.) On January 30, 2003, Dr. Riaz again described Payne's mood as depressed, but described her as fully oriented. (R. at 395.) He prescribed Zoloft. (R. at 395.) On March 11, 2003, Dr. Riaz made the same findings. (R. at 396.) Zoloft was discontinued at that time. (R. at 396.) On May 8, 2003, Payne complained of depression, anxiety and nervousness. (R. at 397.) Dr. Riaz noted that Payne's speech was normal and spontaneous, her mood was restricted and her affect was depressed and anxious. (R. at 397.) She was prescribed Remeron and Zyprexa. (R. at 398.) On June 16, 2003, Dr. Riaz wrote a letter to Payne's attorney, stating that he had seen Payne on four occasions since December 19, 2002, for outpatient psychotherapy and medication checks. (R. at 386.) He noted that he diagnosed Payne with major depression, generalized anxiety disorder and panic disorder. (R. at 387.) Dr. Riaz rated her prognosis as "poor," and noted that she needed to continue outpatient psychotherapy and medications. (R. at 387.) On July 24, 2003, Payne stated that she was taking Vistaril, Trazadone and Lexapro. (R. at 399.) She continued to complain of depression, anxiety and nervousness. (R. at 399.) Dr. Riaz again described Payne's mood as depressed and anxious. (R. at 399.)

On February 22, 2003, Payne was admitted to St. Luke's Hospital with complaints of chest pain with shortness of breath and left arm pain and numbness. (R. at 392-93.) However, testing revealed no cardiac disease. (R. at 392-93.) A stress test performed a couple of days later was normal. (R. at 393.) She was diagnosed with chronic pain syndrome. (R. at 393.)

-15-

Evidence submitted to the Appeals Council reveals that Payne continued to see Dr. Riaz from October 9, 2003, through April 19, 2004. (R. at 411-25.) On October 9, 2003, Payne complained of depression, anxiety, panic attacks and nervousness. (R. at 412.) Her mood was described as depressed and anxious. (R. at 412.) She was diagnosed with major depression, generalized anxiety disorder and panic disorder. (R. at 413.) She was prescribed Trazadone and Lexapro. (R. at 413.) Her complaints remained unchanged on November 25, 2003. (R. at 414.) At that time, she reported medication noncompliance. (R. at 414.) Payne was seen on January 6, 2004, and February 17, 2004, for individual therapy sessions lasting approximately one hour each. (R. at 415-16.) On February 27, 2004, Payne's condition remained unchanged. (R. at 418.) She was prescribed Valium. (R. at 417.) By March 26, 2004, Payne reported sleeping better and not becoming sick on her medications. (R. at 420.) She continued to complain of depression, anxiety, panic attacks and nervousness. (R. at 420.) Dr. Riaz described her affect as restricted and her mood as depressed and anxious. (R. at 420.) Her recent and remote memories were intact, and judgment and insight were present. (R. at 420.)

On April 5, 2004, a licensed psychological counselor[9] performed a psychological evaluation of Payne. (R. at 421-23.) At that time, Payne indicated that she experienced two to three panic attacks per week, worry, racing thoughts and anger. (R. at 421.) The examiner noted that Payne's mood was depressed, she was paranoid, experienced visual hallucinations, had a decreased appetite, had impaired immediate memory and experienced difficulty sleeping. (R. at 421.) However,

---

[9]The name of the examiner is unknown as she signed the treatment notes with initials only. (R. at 423-25.)

Payne's behavior/motor disturbance, thought processes, orientation, speech, appearance, range of affect, insight and self-harm all were within normal limits. (R. at 421.) The examiner recommended weekly counseling sessions to decrease depression and increase self-esteem. (R. at 423.) A Minnesota Multiphasic Personality Inventory, ("MMPI"), also was recommended. (R. at 423.) Payne was diagnosed with major depressive disorder, recurrent, with psychosis, generalized anxiety disorder, borderline intellectual functioning and a then-current GAF score of 51.[10] (R. at 423.) By April 12, 2004, the examiner noted that Payne's appearance was improved from the previous session, and Payne reported sleeping better. (R. at 424.) The following week, Payne reported marital difficulties. (R. at 425.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2004). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2004).

---

[10] A GAF of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

Case 1:04-cv-00065-PMS   Document 26   Filed 04/28/05   Page 17 of 22   Pageid#: 82

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated September 27, 2003, the ALJ denied Payne's claim. (R. at 20-31.) The ALJ found that Payne had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 30.) The ALJ found that the medical evidence established that Payne had severe impairments, namely impaired auditory acuity with associated speech impairment, chronic pain syndrome, arthritis/joint dysfunction, borderline intellectual functioning, an anxiety disorder and a depressive disorder, but she found that Payne did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 30.) The ALJ further found that Payne's allegations regarding her limitations were not totally credible. (R. at 30.) The ALJ found that Payne had the residual functional capacity to perform light work, involving simple, routine tasks and requiring minimal levels of concentration and attention, with a moderate limitation in the ability to deal with the public, co-workers and supervisors and, due to her hearing loss, should not be around loud noises and should avoid tasks that would require more than occasional bending, kneeling, stooping, crouching, balancing and climbing. (R. at 30.) Thus, the

-18-

ALJ found that Payne was unable to perform any of her past relevant work. (R. at 30.) Based on Payne's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ further found that there were other jobs available that Payne could perform. (R. at 30-31.) Thus, the ALJ found that Payne was not under a disability as defined in the Act, and that she was not entitled to benefits. (R. at 31.) *See* 20 C.F.R. § 416.920(g) (2004).

In her brief, Payne argues that the ALJ erred in her weighing of the medical evidence regarding her mental impairment. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-8.) Payne also argues that the ALJ erred by crediting her with a high school education. (Plaintiff's Brief at 9-10.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Payne argues that the ALJ erred in her weighing of the medical evidence. (Plaintiff's Brief at 5-8.) In particular, Payne argues that the ALJ erred by rejecting the opinions of Dr. Riaz and psychologist Wyatt, Payne's treating sources, in favor of the

-19-

nonexamining sources, whose opinions were inconsistent with each other. (Plaintiff's Brief at 7.) Payne also argues that the ALJ erred by failing to consider her psychiatric hospitalization in November 2002. (Plaintiff's Brief at 7.) Finally, Payne contends that the ALJ substituted her own opinion for that of mental health professionals. (Plaintiff's Brief at 8-9.)

It is well-settled that "the [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *see Sterling Smokeless Coal Co.*, 131 F.3d at 439-40 (holding that in determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence); *see also Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). "The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight [s]he has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Dep't of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

It is unclear from the record how the ALJ weighed the evidence relating to

-20-

Payne's mental impairments. Although the ALJ clearly rejected Dr. Riaz's opinions,[11] it is unclear what opinions she accepted and relied upon in concluding that Payne did not suffer from a disabling mental impairment. It further is unclear from the record before the court *how* the ALJ reached such conclusions regarding the evidence relevant to Payne's mental impairments. For instance, while the ALJ discussed the findings of psychologist Wyatt, she neglected to state, or even hint, whether she was accepting or rejecting it. (R. at 24.) Moreover, despite the fact that several other mental health sources' opinions are contained in the record, the only other mention of such evidence in the ALJ's decision consists of two sentences merely stating the findings of a "state agency medical consultant" in November 2001. (R. at 25.) Again, the ALJ did not state whether this evidence was being accepted or rejected or offer any explanation therefor. (R. at 25.) Finally, as noted in Plaintiff's Brief, although she was hospitalized in a psychiatric unit for three days in November 2002, evidence undoubtedly relevant to a determination of disability based on a mental impairment, the ALJ did not include any mention of this in her decision.

For all of these reasons, I cannot find that the ALJ analyzed all of the evidence relevant to Payne's mental impairments, nor that she sufficiently explained her findings and rationale in crediting evidence. Thus, I also cannot find that substantial evidence supports the Commissioner's decision to deny benefits based on Payne's mental impairments.

Payne also argues that the ALJ erred by crediting her with a high school

---

[11]I will not address whether substantial evidence supports the ALJ's rejection of Dr. Riaz's opinions, given the ultimate disposition of this case.

Case 1:04-cv-00065-PMS   Document 26   Filed 04/28/05   Page 21 of 22   Pageid#: 86

education. (Plaintiff's Brief at 9-10.) I disagree. While the ALJ did state in her decision that Payne had a high school education or an education equivalent thereto, the hypotheticals to the vocational expert did not assume an individual with a "high school education," but an individual with a "poor education, including poor reading, writing and math skills." Based on the other evidence of record, I find that such hypotheticals accurately reflected Payne's education and academic skills, regardless of whether she actually graduated from high school or not. Thus, I find this argument to be without merit.

## IV. Conclusion

For the foregoing reasons, the Commissioner's and Payne's motions for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for explicit findings regarding the weighing of the medical evidence, and accompanying rationale therefor, as it relates to Payne's mental impairments and their impact on her work-related abilities.

An appropriate order will be entered.

DATED:        This 28th day of April 2005.

/s/ Pamela Meade Sargent
UNITED STATES MAGISTRATE JUDGE

-22-